# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JESSE BALLARD,

     *Plaintiff*,

CASE NO. 2:13-CV-14662

*v.*

DISTRICT JUDGE PATRICK J. DUGGAN
MAGISTRATE JUDGE PATRICIA T. MORRIS

CAROLYN W. COLVIN
Commissioner of Social Security,

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I. RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II. REPORT

### A. Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB") under

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Title II of the Social Security Act 42 U.S.C. §§ 401 *et seq.* This matter is currently before the Court on cross-motions for summary judgment. (Docs. 18, 20.)

Plaintiff Jesse Ballard's claim arrives in this Court ready for disposition after an already long and circuitous path through the Social Security Administration and the courts. He first sought DIB two decades ago, in July 1994. Brief for Defendant, Ex. 2 at 2, *Ballard v. Comm'r of Soc. Sec.*, No. 10-12518, 2011 WL 2802900 (E.D. Mich. June 24, 2011), *adopted by* 2011 WL 2792438 (E.D. Mich. July 28, 2011). The Commissioner denied the claim and Plaintiff did not appeal; Plaintiff filed another Title II application on February 21, 1995. *Id.* His insured status period, or the period of time in which he could receive benefits, lasted through December 31, 2000, and he stated that his disability began on October 29, 1993. *Id.* at 1. After a hearing on that claim, administrative law judge ("ALJ") John Ransom decided in June 1997 that Plaintiff was not disabled. *Id.* at 9. In the decision, the ALJ noted that res judicata applied to the period preceding the 1994 decision. *Id.* at 2. For the period after, the ALJ determined that Plaintiff could find substantial gainful employment despite suffering from various severe impairments: lower back pain, high blood pressure, diabetes, and depression. *Id.* at 7. Plaintiff later filed suit on the claim in 2000, but the case was dismissed. *Ballard v. Comm'r of Soc. Sec.*, No. 00-75201, slip op. at *1 (E.D. Mich. Aug. 17, 2001).

On April 30, 2007, Plaintiff reapplied for DIB, again alleging an onset date of October 29, 1993. (Transcript, Doc. 6 at 89.) After considering discogenic and degenerative back disorders, and finding that the mental capacity evidence was insufficient to provide a diagnosis, the Administration denied his claim at the initial stage. (Tr. at 50.) On August 14, 2009, Plaintiff amended his alleged onset date to September 11, 2000. (Tr. at 407.) On the same day, he also

2

appeared before ALJ Joanne Adamczyk, who considered the application de novo despite the prior decision in 1997. (Tr. at 28-49.) The ALJ found on November 17, 2009, that Plaintiff was not disabled because he had no severe impairments, (Tr. at 15, 17, 19), and subsequently the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.)

On June 24, 2010, Plaintiff sought judicial review of the Commissioner's unfavorable decision. Compl. at 1, *Ballard*, 2010 WL 2802900. Magistrate R. Steven Whalen issued a Report and Recommendation on June 24, 2011 recommending remand due to the ALJ's failure to properly analyze the res judicata effect of the 1997 ALJ decision. *Ballard*, 2010 WL 2802900, at *1.[2] The 2009 ALJ decision did not analyze whether new or material evidence could allow a variance from the 1997 decision; remand was thus necessary to allow that investigation. *Ballard*, 2010 WL 2802900, at *5-6.

---

[2] In the Sixth Circuit, a prior decision by the Commissioner can preclude relitigation of the same claim in subsequent cases:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling ("AR") 98-4(6), 63 Fed. Reg. 29771, 29773 (June 1, 1998) (acquiescing to *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997)).

This ruling, resulting from the Sixth Circuit's decision in *Drummond*, essentially creates a presumption that the facts found in a prior ruling remain the same in a subsequent unadjudicated period unless "there is new and material evidence" on the finding. *See Makinson v. Colvin*, No. 5:12CV2643, 2013 WL 4012773, at *5 (N.D. Ohio Aug. 6, 2013) (adopting Report & Recommendation) ("[U]nder *Drummond* and AR 98-4(6), a change in the period of disability alleged does not preclude the application of *res judicata*.") (citing *Click v. Comm'r of Soc. Sec.*, No. 07-13521, 2009 WL 136890, at *4 (E.D. Mich. Jan. 16, 2009))); *cf. Randolph v. Astrue*, 291 F. App'x 979, 981 (11th Cir. 2008) (characterizing the Sixth Circuit's rule as creating a presumption); *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988) ("The claimant, in order to overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability, must prove 'changed circumstances' indicating a greater disability." (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985))). The 2009 ALJ decision did not analyze whether new or material evidence could allow a variance from the 1997 decision; remand was thus necessary to allow that investigation. *Ballard*, 2010 WL 2802900, at *5-6.

On remand, the ALJ conducted another hearing,[3] (Tr. at 233-60), and in a written decision accepted the 1997 findings and determined that Plaintiff was not disabled. (Tr. at 219, 227.) The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on September 6, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 209-11.) On November 10, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Compl., Doc. 1.)

### B. Standard of Review

The Social Security system contains a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has

---

[3] The Appeals Council noted that another hearing was necessary to take evidence from a vocation expert ("VE") because the VE "who testified at the [1997] hearing . . . was not asked whether the evidence he provided conflicted with the information in the [Dictionary of Occupational Titles]," as required by a subsequent agency ruling. (Tr. at 318.)

4

failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely

because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written

6

decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

7

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the alleged onset date, September 11, 2000, and the last insured date, December 31, 2000. (Tr. at 222) At step two, the ALJ concluded that Plaintiff had the following severed impairments: "diabetes mellitus and hypertension, a history of low back pain and allegations of depression." (*Id.*). At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (*Id.*) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work as a material handler. (Tr. at 222-23, 225.) The ALJ also found that Plaintiff was forty-three years old on the last insured date, putting him in the "younger individual age" category. (Tr. at 225.) *See* 20 C.F.R. §§ 404.1563, 416.963. At step five, the ALJ found that Plaintiff could perform a limited range of sedentary jobs existing in significant numbers in the regional economy. (Tr. 223-26.)

### E.    Administrative Record

Only five records exist from the relevant period between the disability's onset and the last insured date, and two of those are indecipherable bleached-white copies of originals. (Tr. at 192-96.) On September 11, 2000, the onset date, Plaintiff saw Dr. E. Saeed, who noted Plaintiff's history of diabetes mellitus, hypertension, and lumbosacral pain. (Tr. at 194.) The treatment notes state, "Neck is supple. Lungs are clear. His feet did not show any symptoms of diabetes mellitus." (*Id.*) The next week, Dr. Saeed again examined Plaintiff, finding no evidence of diabetes mellitus in his feet, but noting such "changes" in his eyes. (Tr. at 193.) His glucose level was high and Dr. Saeed referred him for dietary counseling. (*Id.*) After the final visit in the period, on October 11, 2000, Dr. Saeed wrote that Plaintiff's diabetes mellitus and hypertension were "not well

controlled." (Tr. at 192.) He received a referral to an eye specialist, and Dr. Saeed discussed diet and exercise. (*Id.*)

In May 2001 Dr. Saeed found that Plaintiff's eyes "showed no changes of diabetes mellitus," and the rest of the examination was similarly unremarkable. (Tr. at 191.) They again discussed diet and exercise, and Plaintiff also received prescriptions for his blood pressure. (*Id.*) At a return visit later that month, Plaintiff denied new symptoms, asserted his diet had improved, and admitted he did not check his blood sugar level at home. (Tr. at 190.) Dr. Saeed noted that Plaintiff's diabetes mellitus was poorly controlled, and his hypertension, fairly controlled. (*Id.*)

In July 2002 Dr. Saeed wrote that Plaintiff was "not very compliant with his medication or with his diet," and had missed many diabetes classes. (Tr. at 189.) The diabetes continued to cause eye problems, and was still "not well controlled." (Tr. at 188-89.) In August, Dr. Saeed prescribed insulin and also observed that Plaintiff's hypertension was "not well controlled." (*Id.*) Plaintiff also saw an ophthalmologist that Month, Dr. Gary Keoleian. (Tr. at 139.) Plaintiff reported "stable vision," and Dr. Keoleian assessed mild nonproliferative diabetic retinopathy. (*Id.*)

Plaintiff was still struggling to comply with his medication and diet regimen through his next meetings with Dr. Saeed, on September 10, 2002, and May 7, 2003. (Tr. at 187.) He complained that he could not feel areas of his feet, yet also asserted he had no sensory loss. (*Id.*) His eyes remained unchanged during both appointments. (*Id.*) The following three visits in September and October 2003 involved more admonishments to diet and exercise. (Tr. at 185-86.) Through June 2004, Plaintiff remained "very noncompliant with his medication[s]." (Tr. at 184.) He also admitted missing his last ophthalmologist appointment. (*Id.*) Dr. Saeed's notes from the fall and winter of 2004 reflect the same noncompliance issues. (Tr. at 182-83.) In January 2005

10

Plaintiff admitted that he stopped taking his blood pressure medication because it exacerbated his erectile dysfunction. (Tr. at 182.) Plaintiff maintained these complaints during an appointment on March 2, 2005. (Tr. at 181.)

Dr. Christopher Cukrowski examined Plaintiff's eyes on October 23, 2005, confirming the earlier assessment of diabetic retinopathy and adding diabetic macular edema to the diagnoses. (Tr. at 144.) Dr. Cukrowski performed laser surgery on Plaintiff's right eye in February 2006. (Tr. at 170.)

The noncompliance problem continued in the spring of 2006, Dr. Saeed noted; "He is noncompliant with his diabetes and hypertension food or exercise. . . . He is not using all his medication." (Tr. at 177-78.) The rest of the session notes over the next year with Dr. Saeed provide little additional information. (Tr. at 172, 203-08.) Dr. Jamal Hammoud determined that Plaintiff's blood sugar was elevated in April 2007. (Tr. at 145, 146.) However, the medical examination was normal and he recommended diet, exercise, and new medications. (*Id.*) Later that month and again the next, podiatrists examined Plaintiff's feet, not finding any problems caused by diabetes. (Tr. at 147-49.)

In May 2007, Plaintiff filled out a functional capacity report. (Tr. at 130-37.) He explained that he lived with his family, his pain was severe at times, it disturbed his sleep, and his difficulty standing or bending affected his personal care. (Tr. at 131.) However, he did not need reminders to take his medicine or groom himself. (Tr. at 132.) He could not stand long enough to finish cooking, so his wife prepared the meals. (*Id.*) He could complete "very little light housework." (*Id.*) He drove and traveled alone, and approximately once per month he shopped with his wife. (Tr. at 133.) Finances–paying bills, counting change, and handling accounts–did not present a

11

problem. (*Id.*) He no longer had hobbies or visited places on a regular basis. (Tr. at 134.) Asked how long he could walk, he replied, "depends on pain," but he did not need assistive devices. (Tr. at 135-36.) He did not express difficulties with mental or emotional tasks. (Tr. at 135-36.)

At the hearing on August 14, 2009, the ALJ announced on the record that Plaintiff's right leg was recently amputated below the knee and he now used a wheelchair. (Tr. at 30.) She reminded him, however, that they could not consider the recent evidence, only those reports before the last insured date. (Tr. at 31.) Plaintiff's attorney then asked about his social life during the insured period. (Tr. at 32.) "I stayed at home a lot," Plaintiff replied, adding that his brother shopped and handled other indoor and outdoor chores. (Tr. at 32-33.) He sometimes struggled to sleep, because of his back pain, and would end up napping for thirty minutes, three times per day. (Tr. at 33.) Plaintiff agreed that his energy level was "low," explaining, "I was kind of tired" during the day. (Tr. at 34.) He could sit for thirty minutes and stand for fifteen; lying down was the most comfortable position. (*Id.*) Lifting heavy objects was too taxing, he said, and he guessed he could lift a glass of milk, not a gallon. (Tr. at 35.) In 2000, he slept on the second floor of his house, but needed his brother's help to ascend the stairs. (*Id.*)

The ALJ then asked whether Plaintiff used any other treatments for his back pain besides medication. (Tr. at 36-37.) He occasionally had physical therapy sessions, he responded, but those proved ineffectual. (Tr. at 37.) The exercises seemed to aggravate his back. (Tr. at 36-37.) He said he was seeing "Dr. Jones" when the back pain began around 1992, but they never discussed surgery. (*Id.*) Plaintiff remembered that his diabetes was out-of-control in 2000, though he did not recall vision problems. (Tr. at 38.) Plaintiff then told his attorney, who took over questioning, that his back pain prevented him from operating a vehicle. (Tr. at 39.) Plaintiff's brother then testified

12

that Plaintiff's memories were accurate. (Tr. at 39-40.) He believed that if Plaintiff had been able to work in 2000, he would have. (Tr. at 42.) Plaintiff then again testified, telling the ALJ that in 2000 he could walk for approximately fifteen to twenty minutes. (Tr. at 43.)

The ALJ then posed a hypothetical to the vocational expert ("VE"):

> I want you to assume a person of the Claimant's age, education, and work experience . . . . [who] could lift up to ten pounds occasionally, and less than that frequently, that [sic] this person needed the ability to change positions approximately every 60 minutes for a few minutes, could not climb ladders, ropes, or scaffolds, could occasionally, but not frequently, climb stairs or ramps. Could [sic] not work around moving machinery or at unprotected heights, and was limited to simple, routine, repetitive work that did not involve production quotas or pace work.

(Tr. at 46.) The VE responded that the individual could not perform Plaintiff's past work, but could work as an information clerk (2000 positions in Michigan's lower peninsula), an assembler (1200 positions), or a ticket checker (1900 positions). (Tr. at 46-47.) The information clerk and ticket checker positions would be unavailable, but not the assembler jobs, if the individual in addition to the limitations above could not lift more than five pounds, use foot controls, kneel, crawl, stoop, or crouch. (Tr. at 47.) Taking two extra thirty-minute breaks during the day would preclude all employment. (*Id.*) More than one absence per month would also prevent an individual from retaining any job. (Tr. at 48.)

The second hearing was held on September 10, 2012, again in front of ALJ Adamczyk. (Tr. at 234.) Plaintiff testified that he had back problems and diabetes, the latter starting in 1992. (Tr. at 241-42.) The ALJ interjected that Dr. Saeed's notes state that the diabetes developed in 2000. (Tr. at 243.) While he did not have surgery or see a specialist, he claimed he requested to see one. (*Id.*) The physical therapy made the pain worse, so he often stayed in bed. (*Id.*) Walking was also

difficult due to his back pain, and he said his "brother used to walk with me all the time just to keep me up." (Tr. at 245.)

His attorney then asked him to rate his back pain; it was "about a seven or eight" out of ten on a visual analog ("VA") scale, he replied, though it usually grew worse five days each week. (Tr. at 247-48.) His diabetes was also "uncontrolled" about four to five days per week, forcing him to rest in bed for two to three hours. (Tr. at 248.) He claimed he went to the emergency room a few times when this occurred. (Tr. at 253.) As a result, he could not complete household chores and his mother generally would vacuum and clean for him. (Tr. at 248-49.) He had no hobbies during the insured status period, and the pain limited his sleep to four hours per night. (Tr. at 249-50.) He estimated that he could "stand up [for] about two to three hour[s] and walk down . . . to the corner and come back, and then I [had] to sit down." (Tr. at 250.) He could sit comfortably for a few hours, and he believed that a gallon of milk was the heaviest object he could lift. (*Id.*) He could not bend, squat, or pick objects off the floor, but he claimed, "I didn't have [any] difficulty with stairs" if he could rest after using them. (Tr. at 251.) He had a driver's license at the time, though his brother usually drove. (Tr. at 251-52.) He concluded by telling the judge that he complied with his doctor's recommendations. (Tr. at 253-54.)

During the VE's testimony, the ALJ proposed that the VE supplement her testimony with written answers to interrogatories after the hearing, allowing her to adjust for the appropriate numbers from 2000. (Tr. at 257.) *See* Soc. Sec. Admin., *Hearings, Appeals & Litigation Law Manual* I-2-5-36 (allowing supplemental responses). The ALJ ultimately relied on these answers in her decision. (Tr. at 226.) On September 7, 2012, the VE submitted her form. (Tr. at 414-18.) The fifth interrogatory asked the VE to

14

> [a]ssume a hypothetical individual who was born on October 20, 1957, has at least
> a high school education and is able to communicate in English as defined in 20 CFR
> 404.1564 and 416.964, and has work experience as described in your response at the
> time of the hearing. Assume further that this individual has the residual functional
> capacity . . . to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except which includes the ability to stand or walk for approximately 6 hours in an
> 8 hour work day and sit for approximately 2 hours in an 8 hour work day. The
> claimant would need a sit/stand option every 30 minutes to stretch. He was unable
> to climb ladders, ropes or scaffold and could only occasionally climb ramps or stairs.
> He needed to avoid moving machinery and unprotected heights. This individual was
> also limited to simple, routine, repetitive work in a low stress environment. By that
> I mean little or no decision making, no changes in the work setting and no
> production rate or pace work.

(Tr. at 415.) The VE wrote that the individual could not perform Plaintiff's past work, but could

work in various positions in the lower peninsula of Michigan, including as a hand packer (3200

positions), an unskilled office clerk (2600 positions), and in bench assembly (2500 positions). (Tr.

at 415, 418.) If the individual was further limited to sedentary work, he could function in various

positions, in the same location: unskilled office clerk (1000 positions), assembler (1200 positions),

inspector (700 positions), and reception and information clerk (1700 positions). (Tr. at 416, 418.)

Taking extra "unscheduled rest breaks as needed" would preclude employment, as would missing

work one to two days per week or being off task more than twenty percent of the workday. (Tr.

at 416-17.)

### F.    Analysis and Conclusions

#### 1.    Legal Standards

The ALJ determined that during the time Plaintiff qualified for benefits, he had the residual

functional capacity ("RFC") to perform a limited range of sedentary work:

> [T]he claimant had the residual functional capacity perform a restricted range of
> sedentary work as defined in 20 CFR 404.1567(b). The claimant needed the option
> for a sit/stand option every 30 minutes to stretch; no climbing of ladders, ropes or
> scaffolds; and only occasional climbing of ramps or stairs. Further he could not

15

kneel, crawl or crouch. The claimant could not work around moving machinery or at unprotected heights. He was limited to simple, routine, repetitive work in a low stress environment, that is, little or no decision-making, no changes in the work setting and no production rate or pace work.

(Tr. at 223.) Sedentary work

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ's five-step disability analysis utilized the proper legal standard. I next consider whether substantial evidence supports the ALJ's decision.

## 2.      Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence could justify the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff attacks the ALJ's credibility finding, asserting that his testimony and a few medical records show that "the judge was clearly incorrect . . . ." (Doc. 9 at 10.) The argument, however, has no analytical heft; the brief merely recites the evidence without demonstrating how it fits regulatory factors or furthers his case. (*Id.* at 10-11.) Plaintiff tucks another conclusion on the tail-end of his factual recitation: "Simply said the hypothetical the judge decided to follow was woefully inadequate and did not mirror Jesse Ballard in every relevant aspect." (*Id.* at 12.) In particular, the ALJ allegedly ignored Plaintiff's likely absenteeism and need for unscheduled

16

breaks. (*Id.*) Plaintiff does not arrange any facts that could lead to these conclusions. The brief then discourses on treating source law without so much as naming any medical source–anywhere in the brief–or even any facts relevant to that subject. (*Id.* at 12-14.)

I suggest that any treating source argument is waived, and that the ALJ's credibility analysis and RFC are supported by substantial evidence.

### a.    Medical Sources and Plaintiff's Credibility

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions"

are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his

physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

> (i)     [D]aily activities;
>
> (ii)    The location, duration, frequency, and intensity of . . . pain;
>
> (iii)   Precipitating and aggravating factors;
>
> (iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v)    Treatment, other than medication, . . . received for relief of . . . pain;
>
> (vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a

20

determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

**b.    Analysis**

Plaintiff only develops arguments on two of his three claims; I suggest that the third, his treating source contention, is waived. The Sixth Circuit has explained waiver in this context: "This court has consistently held that . . . arguments adverted to in only a perfunctory manner, are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). *See also Aarti Hospitality, L.L.C. v. City of Grove City, Ohio*, 350 F. App'x 1, 11 (6th Cir. 2009) ("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed . . . . Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner); *Preston v. Comm'r of Soc. Sec.*, No. 12-13327, 2013 WL 4550512, at *7 (E.D. Mich. Aug. 28, 2013) (finding waiver where "Plaintiff failed to identify a specific medical opinion the ALJ erred in evaluation") (adopting Report & Recommendation); *Perry ex rel. King v. Comm'r Soc. Sec.*, No. 12-cv-14439, 2013 WL 3328523, at *7 (E.D. Mich. July 2, 2013) ("Plaintiff cites to case law that ALJs must provide good reasons for discounting the opinions of the claimant's treating physicians, but she has not identified any treating physician opinion that she believes the ALJ overlooked or improperly weighed.") (adopting report and recommendation).

Plaintiff here never states by name any of the medical sources, or develops any contention based on their opinions. In fact, the record lacks anything like a true medical opinion on Plaintiff's functional capacity for the ALJ to accept or reject. Dr. Saeed, the only plausible treating source, spent most of his treatment notes carping that Plaintiff failed to comply with his recommendations.[4] (Tr. at 177-78, 182-84, 187, 189, 190.) Nor would any of Dr. Saeed's observations, without more, require the ALJ to find a disability. He occasionally noted diabetes-related eye problems, and Plaintiff's ophthalmologists confirmed those troubles. (Tr. 144, 188-89, 193.) But the Dr. Saeed's reports give little objective indication that Plaintiff's diabetes or hypertension manifested in debilitating symptoms. In any case, the Plaintiff does not develop the argument and I recommend that neither should the Court.

Plaintiff's claim hinges on three pages of evidence, the only reports from the insured period. Yet, his "medical record snapshot," his entire discussion of the evidence, scrunched into a short paragraph, focuses on the post insured-status period, cutting down the relevant records to two curt sentences. (Doc. 9 at 11.) The bulk of the record thus has meager probative value. Post-insured period records are "generally not relevant" unless they "establish that an impairment existed continuously and in the same degree from the date the insured status expired." *Collins v. Astrue*, No. 3:12-cv-089, 2013 WL 80363, at *3 (S.D. Ohio Jan. 7, 2013) (citing *Bogle v. Sec. of Health & Human Servs.*, 998 F.2d 342 (6th Cir. 1993); *Johnson v. Sec. of Health & Human Servs.*, 679 F.2d 605 (6th Cir. 1982); *Bagby v. Harris*, 650 F.2d 836 (6th Cir. 1981)). "Evidence of disability obtained after the expiration of insured status is generally of little probative value." *Strong v. Social Sec. Admin.,* 88 F. App'x 841, 845 (6th Cir. 2004). In order for evidence of the plaintiff's

---

[4] Noncompliance does not always weigh in favor of finding non-disability, SSR 96-7p, 1996 WL 374186, at *7-8, but here Plaintiff does not justify his decision to forgo the diabetic diet, exercise, and medications.

condition after the date last insured to be relevant, the evidence "must relate back to the claimant's condition prior to the expiration of her date last insured." *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003).

Here, the subsequent records show ongoing difficulties, and consequently are not altogether irrelevant. (Tr. at 188-89, 191.) But nearly all that Plaintiff cites from these records are diagnoses that are not converted into concrete limitations, (Doc. 9 at 10): Plaintiff had retinopathy, (Tr. at 139, 143, 170), mascular edema, (Tr. at 144), diabetes mellitus, (*Id.*), and hypertension, (Tr. at 194). The most Plaintiff adds is noting that the latter two diagnoses were "uncontrolled." (Doc. 9 at 11); (Tr. at 192.) And no medical records exist from Plaintiff's amputation. Thus, even if the post-insured evidence were within the relevant period, it would not detract from the ALJ's conclusion.

The ALJ's credibility analysis was also proper. In her decision, she noted that when testifying Plaintiff sometimes forgot to keep his answers relevant to the last three months of 2000. (Tr. at 223.) This occurred during the second hearing, (Tr. at 245-46), and emphasizes the decade or more separating the events from his testimony. The holes in his memory showed, as his testimony at the hearings and his functional capacity report display several minor but telling inconsistencies. In 2009, he said he could lift a glass of milk, not a gallon; in 2012, he could lift and carry a gallon. (Tr. at 35, 250). In 2009, he estimated he could stand for fifteen minutes before tiring; in 2012, he could stand for two to three hours. (Tr. at 34, 250.) In 2009, he remembered that he struggled climbing the stairs to his bedroom, needing his brother's help; in 2012 he recalled, "I didn't have no difficulty with stairs," he just needed to rest after using them. (Tr. at 35, 251).

23

In 2009, he guessed that he could have sat for thirty minutes; in 2012, that guess ballooned to sitting comfortably for a few hours. (Tr. at 34, 250.)

Even if the ALJ selected the lower estimates from 2009, there was no corroborating objective evidence. The three relevant records certainly did not indicate he was disabled: he had a supple neck, clear lungs, feet without evidence of diabetes mellitus, and normal blood pressure. (Tr. at 192-94.) As the ALJ pointed out, the reports relate a history of lumbosacral pain, but no current complaints of it. (Tr. at 224.) She cautiously drew the reasonable conclusion from the dearth of references to back pain: it "suggests the absence of any disabling back impairment on or prior to December 31, 2000." (*Id.*)

The post-insured status evidence similarly supports the ALJ's decision. For example, Plaintiff did not report any foot pain to the podiatrist in 2006. (Tr. at 147-49, 225.) Plaintiff's evidence is so weak, in fact, that Magistrate Judge Whalen agreed with the ALJ's 2009 "conclusion that Plaintiff's diabetes was non-severe . . . . Standing alone, substantial evidence supports the ALJ's finding that Plaintiff did not experience severe impairments." *Ballard*, 2011 WL 2802900, at *4. Remand came only because the ALJ missed the critical res judicata analysis.

The RFC is generous to Plaintiff. It limits him to sedentary work with a "sit/stand option every 30 minutes to stretch." (Tr. at 223.) This would accommodate Plaintiff's conservative estimates from the 2009 hearing, and would be more than needed to account for his 2012 hearing estimates. Plaintiff testified at the second hearing that he could climb stairs, followed by a rest. (Tr. at 251.) The RFC credits this by limiting him to occasional stair and ramp climbing. (Tr. at 223.) The RFC even restricts him to simple, routine work, despite the absence of any evidence that Plaintiff had mental health issues. (*Id.*) Plaintiff stated in his functional report that he had no such

24

problems and could, additionally, manage his finances. (Tr. at 133.) The report also said that difficulties bending hampered his personal care. (Tr. at 131.) The RFC accordingly eliminated jobs that required similar movements, such as kneeling, crawling, or climbing ropes and ladders. (Tr. at 223.) In short, despite reasonably doubting the extent of his subjective complaints, the RFC acknowledges each alleged limitation, perhaps further even than the objective evidence would warrant.

### 3.  Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.

*Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 29, 2014          /S Patricia T. Morris
                                 Patricia T. Morris
                                 United States Magistrate Judge

### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  October 29, 2014          By     s/*Jean L. Broucek*
                                 Case Manager to Magistrate Judge Morris